UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                          Case No: 8:22-cr-0156-KKM-MRM

JORDAN PATRICK LEAHY,

      Defendant.
_____

## ORDER

      A grand jury returned an Indictment against Jordan Leahy, finding probable cause that Leahy used "force and threat of force" to "willfully intimate and interfere with" a man's use of a public roadway because of his race or color. (Doc. 1 at 1.) Leahy moves to dismiss the Indictment, arguing that Congress lacks power to criminalize his conduct, (Doc. 20), and that the Indictment divides one offense into two Counts, (Doc. 21). His motions fail because the Thirteenth Amendment's enforcement clause provides Congress the requisite authority and the Indictment is not multiplicitous.

**I.   BACKGROUND**

      On August 8, 2021, J.T., a black male, was driving with his girlfriend and daughter to visit family in Clearwater, Florida. (Doc. 1 at 1.) To get there, he drove along Starkey Road in Pinellas County. (*Id.*)

      Jordan Leahy was also driving on Starkey Road. According to the government, Leahy drove close to J.T. and shouted racial epithets. (Doc. 20 at 2.) After a time, Leahy's driving forced J.T. to pull off the road. (*Id.*) Leahy then

stopped too. Both men exited their cars. Leahy approached J.T., and—after a "brief scuffle"—J.T. subdued Leahy. (*Id.*) Police arrested Leahy a short time later.

A grand jury found probable cause to return a two-count Indictment based on the encounter. Count I charges that Leahy used "force and threat of force" to "willfully intimate and interfere with J.T., and attempt[ed] to injure, intimidate, and interfere with J.T., because of J.T.'s race and color, and because J.T. was enjoying a facility provided and administered by the State of Florida." (Doc. 1 at 1–2.) Leahy's acts include "the use, attempted use, and threatened use of a dangerous weapon, that is, a vehicle." (*Id.* at 1–2.) Count II is nearly identical, but it omits reference to a dangerous weapon and charges only an "attempt to injure, intimidate, and interfere," (*Id.* at 2), rather than an attempt and a completed offense.

The Indictment tracks 18 U.S.C. § 245(b)(2)(B).[1] That section makes it a crime to use "force or threat of force [to] willfully injure[], intimidate[] or interfere[] with" a "person because of his race" or color and because he is "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or

---

[1] In relevant part, § 245(b)(2)(B) criminalizes acts and threats motivated by race and a desire to deter another person from using a public benefit or to punish him for using it:

> (b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
>
> . . . .
>> (2) any person because of his race, color, religion or national origin and because he is or has been—
>
> . . . .
>>> (B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;
>
> . . . .
> shall be fined under this title, or imprisoned not more than one year, or both; and … if such acts include the use, attempted use, or threatened use of a dangerous weapon, … shall be fined under this title, or imprisoned not more than ten years, or both. . . .

2

administered by any State or subdivision thereof." If those acts involve "the use, attempted use, or threatened use of a dangerous weapon," the maximum term of imprisonment increases from one year to ten years. *Id.*

## II.  ANALYSIS

Leahy moves to dismiss the Indictment. He argues that § 245(b)(2)(B) is unconstitutional on its face and as applied to him. (Doc. 20.) He separately argues that the Indictment is multiplicitous. (Doc. 21.) The government opposes both motions. (Doc. 26; Doc. 27.) With leave of the Court, Leahy replies. (Doc. 31.)

### A.  Section 245(b)(2)(B) is Not Unconstitutional

The Constitution furnishes the federal government limited powers. To act, the federal government must trace its authority to the Constitution.

Leahy moves to dismiss the Indictment, arguing that Congress lacks the power to enact 18 U.S.C. § 245(b)(2)(B). Under governing precedent, he is mistaken. The Supreme Court's interpretation of the Thirteenth Amendment's enforcement clause provides the requisite authority to enact § 245(b)(2)(B) and to criminalize Leahy's conduct. The Court therefore does not consider other potential sources.

#### 1.  Congress May Rationally Find the Badges and Incidents of Slavery

The Thirteenth Amendment comprises two sections. *See* U.S. CONST. amend. XIII. "By its own unaided force and effect," section one "abolished slavery, and established universal freedom." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440–43 (1968) (quoting *The Civil Rights Cases*, 109 U.S. 3, 20 (1883)).

The second section grants Congress the "power to enforce this article by appropriate legislation." U.S. CONST. amend. XIII, § 2. This enforcement power

3

includes the authority to "pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *The Civil Rights Cases*, 109 U.S. at 20; *see NAACP. v. Hunt*, 891 F.2d 1555, 1564 (11th Cir. 1990). The Supreme Court has interpreted that enforcement authority to include a power "rationally to determine what are the badges and the incidents of slavery." *Jones*, 392 U.S. at 440. In other words, "Congress itself has power to determine those badges and incidents." *United States v. Hatch*, 722 F.3d 1193, 1195 (10th Cir. 2013). For that reason, courts "give great deference" to a "congressional determination that [a statute] will effectuate the purpose of the Thirteenth Amendment by aiding in the elimination of the 'badges and incidents of slavery in the United States.'" *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 120 (5th Cir. 1973) (quoting *Jones*, 392 U.S. at 439)). In sum, the Supreme Court's decision in *Jones* requires that lower courts uphold congressional acts that rationally determine that a practice is a badge or incident of slavery.

Leahy disagrees with this hornbook description, arguing that *Jones* is not good law. For support, he points to two Supreme Court cases interpreting Congress's enforcement power under the Fourteenth and Fifteenth Amendments. *See City of Boerne v. Flores*, 521 U.S. 507 (1997); *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013). *City of Boerne* explained that the Fourteenth Amendment's enforcement clause gives Congress a power to remedy violations of the Amendment, not a power to decide what conduct violates it. *See City of Boerne*, 521 U.S. at 519. *Shelby County* required that Congress justify any remedial measures under the Fifteenth Amendment with current, rather than past, conditions. *See Shelby Cnty.*, 570 U.S. at 553.

4

*Jones*, Leahy argues, conflicts with both cases' reasoning. Unlike *City of Boerne*, *Jones* allows Congress to define its enforcement power so long as its decision is not irrational. And unlike *Shelby County*, *Jones* does not require Congress to find that its enforcement method addresses current conditions, rather than those existing when Congress enacted § 245 in 1968. *See* Pub. L. No. 90-284, § 101, 82 Stat. 73, 73–75 (1968). The contrast increases when one recalls that the Reconstruction Amendments were adopted in quick succession and that the enforcement clauses use similar wording. *Compare* U.S. CONST. amend. XIII, § 2 ("Congress shall have power to enforce this article by appropriate legislation."), *with* U.S. CONST. amend. XIV, § 5 (The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."), *and* U.S. CONST. amend. XV, § 2 ("The Congress shall have the power to enforce this article by appropriate legislation."). So too, *Jones*'s approach seems to allow Congress to intrude on traditional state authority over criminal law, a federalism concern that appears in *City of Boerne* and *Shelby County*. *See City of Boerne*, 521 U.S. at 520–24; *Shelby Cnty.*, 570 U.S. at 549.

All in all, Leahy's argument is not without force. Tension exists between *Jones* and these later Supreme Court decisions. Yet, despite challenges like the one Leahy brings here, lower courts continue to apply *Jones*. *See United States v. Diggins*, 36 F.4th 302 (1st Cir. 2022); *United States v. Roof*, 10 F.4th 314, 391 (4th Cir. 2021); *United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018); *United States v. Maybee*, 687 F.3d 1026, 1030 (8th Cir. 2012); *United States v. Hatch*, 722 F.3d 1193 (10th Cir. 2013).

In doing so, some courts sympathize with the position that Leahy advances. *See Cannon*, 750 F.3d at 509 (Elrod, J., specially concurring) (expressing concern over the "growing tension between" the Reconstruction Amendments); *Hatch*, 722 F.3d at 1204 ("At its core, [defendant's] argument raises important concerns we share."). But even these courts agree that *Jones* remains binding precedent. So do I.

While the tension between them is undeniable, *City of Boerne* and *Shelby County* did not overrule *Jones*. Indeed, "neither case mentions the Thirteenth Amendment, neither cites *Jones*, and neither discusses Congress's power to identify and legislate against the badges and incidents of slavery." *Roof*, 10 F.4th at 394. And the task of harmonizing its decisions rests with the Supreme Court. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). *Jones* continues to govern "unless and until it is overruled by [the Supreme] Court." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part). And so do the opinions applying *Jones* in this circuit. *See Bob Lawrence Realty*, 474 F.2d at 120; *Hunt*, 891 F.2d at 1564.

Defeated in the larger argument about *Jones*'s vitality, Leahy shifts ground. He argues that, even if *Jones* is binding, it applies only to its facts: race discrimination in contracts for real property. It does not extend, he argues, to "private, racially motivated violence." (Doc. 20 at 13.)

*Jones*'s rational-determination test is not so narrow. The Supreme Court has treated it as the governing test under the Thirteenth Amendment's enforcement clause. *See Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (applying *Jones* to uphold 42 U.S.C. § 1985(3)); *Runyon v. McCrary*, 427 U.S. 160, 168 (1976) (relying on *Jones*

6

to uphold 42 U.S.C. § 1981); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 197 (1989) (Brennan, J. concurring in part) (explaining that Congress may "identify and legislate against the badges and incidents of slavery"). In doing so, the Supreme Court already applied it to private, racially motivated violence. *See Griffin*, 403 U.S. at 90–91, 101–02, 105.

In sum, despite tension with the Supreme Court's decisions on the other Reconstruction Amendments, *Jones* and its rational-determination test are binding. And they will remain that way until the Supreme Court says otherwise.

### 2. Congress Rationally Found that Racially Motivated Violence Because of the Use of Public Facilities is a Badge and Incident of Slavery

Under its Thirteenth Amendment enforcement power, Congress may abolish all badges and incidents of slavery, and may rationally determine what those badges and incidents are. *See Jones*, 392 U.S. at 440. While "badges" and "incidents" are historic terms of art, courts may disagree with Congress's use of those terms only if irrational. *See Bob Lawrence Realty*, 474 F.2d at 120–21; *see also* Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. PA. J. CONST. L. 561, 575 (2012).

The badges and incidents of slavery "extend far beyond the actual imposition of slavery or involuntary servitude." *Griffin*, 403 U.S. at 105. Relying on historical usage of these terms, courts uniformly conclude that racially motivated violence is a badge or incident of slavery. *See, e.g.*, *Roof*, 10 F.4th at 392 (stating "emphatically that concluding there is a relationship between slavery and racial violence 'is not merely rational, but inescapable'" (quotation omitted)). Or—at the very least—that Congress did not act irrationally in so finding. *See Cannon*, 750 F.3d at 502; *Hatch*, 722 F.3d at 1195.

7

The connection is rational because "racially motivated violence was essential to the enslavement of African-Americans and was widely employed after the Civil War in an attempt to return African-Americans to a position of de facto enslavement." *Cannon*, 750 F.3d at 502. And so, "Congress could rationally conclude that physically attacking a person of a particular race because of animus toward or a desire to assert superiority over that race is a badge or incident of slavery." *Hatch*, 722 F.3d at 1206; *accord Diggins*, 36 F.4th at 311 ("By any measure, Congress's judgment that racially motivated violence constitutes one of the badges and incidents of slavery easily satisfies *Jones*'s rational-determination test.").

The same reasoning applies here. Section 245(b)(2)(B) criminalizes racially motivated violence. That alone is enough to bring § 245(b)(2)(B) within the ambit of the badges and incidents of slavery. *See, e.g.*, *Hatch*, 722 F.3d at 1206 ("Congress could conceive that modern racially motivated violence communicates to the victim that he or she must remain in a subservient position, unworthy of the decency afforded other races.").

But § 245 is even more closely connected to historic signs of slavery. It is beyond question that "acts of violence or force committed against members of a hated class of people with the intent to exact retribution for and create dissuasion against their use of public facilities have a long and intimate historical association with slavery and its cognate institutions." *United States v. Nelson*, 277 F.3d 164, 189 (2d Cir. 2002). Far from a general federal tort code, § 245 is tailored to that subset of racial violence. Section 245(b) criminalizes "force and threat of force" only if it is prompted by a victim's race and his use of a public facility or benefit. § 245(b)(2)(B). This "narrowing" requirement makes it easier to conclude that

8

Congress satisfies the rationality test. *Nelson*, 277 F.3d at 191 n.25; *cf. Griffin*, 403 U.S. at 105 (upholding a cause of action for victims of "racially discriminatory private action aimed at depriving them of the basic rights that the law secures").

The decisions of other circuits are in accord. In fact, all courts to address § 245(b)(2)(B) agree that it falls within Congress's power to enforce the Thirteenth Amendment. *See Nelson*, 277 F.3d at 190; *United States v. Bledsoe*, 728 F.2d 1094, 1097 (8th Cir. 1984); *United States v. Sandstrom*, 594 F.3d 634, 660 (8th Cir. 2010); *United States v. Allen*, 341 F.3d 870, 884 (9th Cir. 2003); *United States v. Cazares*, 788 F.3d 956, 989–90 (9th Cir. 2015); *see also United States v. Maybee*, 687 F.3d 1026, 1031 (8th Cir. 2012) (relying on precedents upholding § 245 to uphold 18 U.S.C. § 249).

Leahy's alleged conduct here does not compel a different result. The Indictment charges that Leahy used force or threats of force (along with a dangerous weapon) to interfere or attempt to interfere with J.T.'s use of a public road because of J.T.'s race. (Doc. 1 at 1–2.) Just as there can be no "doubt that interfering with a person's use of a public park because he is black is a badge of slavery," so it is with roads. *Bledsoe*, 728 F.2d at 1097.

In sum, Congress rationally concluded that attempted, threatened, or actual force that is motivated by racism and a desire to punish or dissuade an individual from using a public facility or benefit because of his race is a badge or incident of slavery. Thus, under *Jones*, § 245(b)(2)(B) is a constitutional exercise of Congress's power under the Thirteenth Amendment both on its face and as applied to Leahy.

### B.  The Indictment is Not Multiplicitous

9

Leahy also argues that the Indictment is multiplicitous because it attempts to split a single offense under § 245(b) into two Counts. (Doc. 21.) Leahy is mistaken.

An indictment is multiplicitous if it charges a single offense in multiple counts. *See United States v. Langford*, 946 F.2d 798, 802 (11th Cir. 1991). When multiple charges arise from the same statute and the same occasion, multiplicity turns on the "allowable unit of prosecution."[2] *United States v. Smith*, 231 F.3d 800, 815 (11th Cir. 2000); *accord United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952)). In other words, it turns on how the statute defines the crime. If a statute describes the offense as a course of conduct, an indictment cannot separate it. But if the statute treats a continuous transaction as separate prohibited acts, multiple charges may lie. *See United States v. Davis*, 730 F.2d 669, 672 (11th Cir. 1984).

Section § 245(b) provides for multiple offenses within a single course of conduct. That conclusion is clear from § 245(b)'s prohibited conduct, punishments imposed, and differentiated structure.

Begin with the prohibited conduct. Section 245(b) provides for criminal penalties for a person who "by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with" another person in enumerated situations. This language does not criminalize an ongoing course of conduct, like possession of a firearm or participation in an illegal gambling business. *See United States v. Jones*, 601 F.3d. 1247, 1259 (11th Cir. 2010) (explaining that possession is a single offense unless it is interrupted and then

---

[2] In contrast, courts apply the same-elements test from *Blockburger* when a defendant's conduct violates separate statutes. *See Sanabria v. United States*, 437 U.S. 54, 70 n.24 (1978). *Blockburger* itself follows this pattern, applying one test to multiple charges under the same statute and another to charges arising under separate statutes. *See Blockburger v. United States*, 284 U.S. 299, 302–04 (1932).

10

resumed); *Sanabria v. United States*, 437 U.S. 54, 70–71 (1978) (holding that participation in a gambling business is a single, ongoing offense).

Instead, § 245(b) identifies discrete acts that violate the statute: injuring, intimidating, or interfering. *See Davis*, 730 F.2d at 672 ("Whether a continuous transaction [is] but a single offense or separate offenses . . . is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed."). The statute's use of these verbs to describe the prohibited conduct shows that Congress criminalized individual acts that may be divided into separate offenses. *Cf. United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) (determining that each interstate wire transmission may form the basis of a separate count); *Blockburger v. United States*, 284 U.S. 299, 302 (1932) ("Each of several successive sales constitutes a distinct offense, however closely they may follow each other.").

The punishments § 245(b) provides point in the same direction. The statute repeatedly describes the prohibited conduct in terms of distinct acts. *See* § 245(b) (providing enhanced punishment if "injury results from the *acts* committed in violation of this section or if such *acts* include the use, attempted use, or threatened use of a dangerous weapon," or "if death results from the *acts* committed in violation of this section or if such *acts* include kidnapping" (emphasis added)).

Section 245(b)'s structure provides a final clue. The statute's prohibitions apply in various settings. For example, § 245(b) prohibits interfering with a person's right to vote, § 245(b)(1)(A), with enjoyment of a federal benefit, § 245(b)(1)(B), with service as a juror, § 245(b)(1)(D), with traveling in interstate commerce, § 245(b)(2)(E), and, of course, with using a state benefit or facility,

11

§ 245(b)(2)(B). These permutations suggest a person may violate § 245(b) in numerous ways, each giving rise to separate offenses based on the discrete acts of injuring, interfering, and intimidating.

Leahy pushes back, invoking the rule of lenity. But lenity applies only if, after exhausting the tools of statutory interpretation, "there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76, (2013) (quotation omitted). But § 245(b) is not ambiguous. It plainly punishes each discrete act that injures, intimidates, or interferes with a person's use or enjoyment of the enumerated rights and privileges.

But even if § 245(b) prohibits a course of conduct rather than distinct acts, Leahy's motion still fails. To decide if the Indictment improperly separates a single course of conduct, Leahy would apply the same-impulse test. That test asks whether a defendant's acts stemmed from a single impulse or from successive ones. *See Blockburger*, 284 U.S. at 302. Often, the knotty factual issue of a defendant's impulses is best addressed after the government presents evidence at trial. *See Jones v. Sec'y, Dep't of Corr.*, 778 F. App'x 626, 635 (11th Cir. 2019) (per curiam) (explaining the second step of the multiplicity analysis is to "review the evidence to see how many distinct criminal acts the defendant committed" (quotation omitted)); *accord United States v. Bonavia*, 927 F.2d 565, 569 (11th Cir. 1991) (reasoning that whether the conduct was properly divided depends on the trial evidence); *see also United States v. Eaves*, 877 F.2d 943, 947 (11th Cir. 1989) (applying the same-impulse test to facts developed at trial). In other words, courts are ill equipped to parse impulses from an indictment. Impulses under § 245(b)

are no exception. *See Sandstrom*, 594 F.3d at 652 (applying the same-impulse test to § 245(b)(2)(B) and looking at the trial evidence to decide if the conduct was interrupted in time, location, or purpose).

In sum, § 245(b) contemplates multiple offenses that are triggered by discrete acts, not an ongoing course of conduct that must be charged as a single offense. For that reason, the Indictment is not multiplicitous simply because it charges multiple violations of § 245(b). And whether the facts support separate charges is an issue for trial or a post-trial motion.

### III. CONCLUSION

For the reasons stated, Leahy's Motions to Dismiss the Indictment (Doc. 20; Doc. 21) are **DENIED**.

**ORDERED** in Tampa, Florida, on July 19, 2022.

*[Signature]*
Kathryn Kimball Mizelle
United States District Judge